United States District Court
For the Northern District of California

1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

8

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
10  SUZETTE C. GOMEZ,

11              Plaintiff,                       No. C 04-03848 MEJ

12       v.                                      **ORDER DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR REMAND**

13  JO ANNE B. BARNHART,
    Commissioner of Social Security,

14                                               **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**
15              Defendant.
    _____/
16
17
18                              **I.  INTRODUCTION**

19          Plaintiff Suzette C. Gomez ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), seeking

20  judicial review of the Commissioner of Social Security's final decision denying her claim for disability

21  insurance benefits.  Pending before the Court are Plaintiff's Motion for Summary Judgment or, in the

22  Alternative, Remand for Additional Proceedings, and Defendant's Cross-Motion for Summary Judgment.

23  Having read and considered the parties' papers, the administrative record, and the relevant legal authority,

24  the Court hereby DENIES IN PART Plaintiff's motion for summary judgment and GRANTS Plaintiff's

25  motion for remand, and GRANTS IN PART and DENIES IN PART Defendant's cross-motion for

26  summary judgment for the reasons set forth below.

27  ///

28  ///

## II. BACKGROUND

**A.      Procedural History**

On October 29, 2001, Plaintiff filed an initial application for disability insurance benefits under Title II of the Social Security Act, alleging a disability onset date of July 16, 1998.[1] (Transcript ("Tr"), 31-36). The Social Security Administration ("SSA") denied the initial application on February 26, 2002.  (*See* Defendant's Notice, Motion and Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Defendant's Memo") at 2).  On July 22, 2002, Plaintiff filed the current application for a period of disability and disability insurance benefits under Title II. (Tr. 91-93).  The SSA denied the current application on October 21, 2002, finding that she was not disabled under its rules.  (Tr. 75-78).

On December 18, 2002, Plaintiff filed a Request for Reconsideration, stating that she did not agree with the SSA's determination.  (Tr. 79).  She cited the "combination of [her] psychological and medical problems" as the reason for her inability to engage in substantial gainful activity.  *Id*.  On February 18, 2003, upon reconsideration of Plaintiff's claim, the SSA affirmed its denial of Plaintiff's application, stating that her condition did not preclude her from other work activities.  (Tr. 81-84).  The SSA found that although Plaintiff "experienced discomfort in [her] neck and arm," she had the ability to "move about" and "use [her] arms and hands in a satisfactory manner."  (Tr. 81).  In regards to Plaintiff's mental state, the SSA found that she retained the ability to "communicate and act in [her] own best interests, and to understand, remember, and carry out basic instructions."  *Id*.

On April, 24,  2003, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (Tr. 85).  On October 21, 2003, ALJ William B. Churchill held a hearing on the matter.  (Tr. 400-454).  At the hearing, Plaintiff appeared in person and was represented by Giocanda Egan.  (Tr. 402).  Also present was Nancy Rynd, a vocational expert.  *Id*.

---

[1]There is a discrepancy in the Administrative Record with respect to the alleged onset date of Plaintiff's disability.  The Administrative Law Judge's decision reflects Plaintiff's inability to work began on September 16, 1998.  (Tr. 17).  However, the weight of the evidence found in the record (i.e. Disability Report, Pain Questionnaire,  Medical Reports, and Oral Hearing Transcript) all reflect that  July 16, 1998 was the actual onset date of disability.  (Tr. 38, 58, 226, 409).

1    On November 4, 2003, ALJ Churchill rendered an "unfavorable" decision concluding that Plaintiff

2    was not disabled within the meaning of the Social Security Act.  (Tr. 14-16).  The ALJ's decision became

3    final when the Appeals Council declined Plaintiff's request for review on July 28, 2004.  (Tr. 6-8).  Plaintiff

4    then filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

5    **B.    Factual Background**

6        1.    <u>Education and Work Experience</u>

7        Plaintiff was 45 years old at the time of the oral hearing on October 21, 2003.  (Tr. 405).  She has

8    twelve years of education.  (Tr. 406).  From 1986-1987, she worked as a bookkeeper.  (Tr. 47-48).

9    From 1988-1998, she worked as an airline cabin service worker and ramp agent.  (Tr. 47, 49-50).  From

10   1996-1998, Plaintiff also worked as a "picker/packer.[2]  (Tr. 47, 407-409).  From 1999 to 2001,

11   subsequent to the alleged onset date of disability, she worked as a children's bible study teacher.[3]  (Tr. 47,

12   407-408).

13       2.    <u>Medical History</u>

14       On July 16, 1998, Plaintiff suffered a work-related injury while stacking luggage in a cargo bin

15   beneath an airplane.  (Tr. 18, 409).  As a result of being "hit" by one of the bags, Plaintiff sustained neck

16   and shoulder injuries, as well as neurological damage to her right (dominant) arm.  (Tr. 18, 140, 144, 412).

17   The record reflects that Plaintiff made multiple emergency room visits to SFO Medical Center/Services

18   beginning July 17, 1998 through 1999.  (Tr. 41).

19       On December 16, 1998, Dr. Andrew G. Rosenberg, M.D., diagnosed Plaintiff with the following:

20   stress urinary incontinence, spinal headache, allergic rhinitis and sinusitis, allergic dermatitis, anxiety,

21   depression, and migraine headaches.  (Tr. 211).

22       On January 27, 1999, Dr. Richard Gravina, M.D., performed a magnetic resonance imaging

23   ("MRI") of Plaintiff's cervical spine.  (Tr. 209).  Dr Gravina's report listed the following conclusion:

24

25   [2]At the hearing, Plaintiff testified to packing chemicals and laboratory equipment for a scientific
     company entitled Van Waterson Rogers.  (Tr. 408).

26

27   [3]ALJ Churchill found that Plaintiff's subsequent work as a Bible study teacher for one hour per week,
     for which she was paid $10.00 per hour, did not constitute substantial gainful activity.  (Tr. 18, 22).

28                                                          3

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   "Degenerative changes at C5-6 with reversal of curvature and disc space loss but no definite protrusion into

2   the spinal canal affecting the spinal cord." *Id*.  The following month, nerve conduction studies rendered

3   "normal" results.  (Tr. 291).  According to Dr. Baiz, Plaintiff's persistent complaints of pain in her neck and

4   right arm were consistent with a radicular problem.  (Tr. 227).  He recommended that Plaintiff undergo a

5   cervical myelogram CT scan.  *Id*.  On May 26, 1999, Dr. Gravina concluded that the myelogram CT scan

6   did not demonstrate a surgical lesion, but listed Plaintiff's condition as "permanent and stationary,[4]" and

7   precluded her from "heavy work."  (Tr. 288).  He expressed that although Plaintiff could not have returned

8   to her former occupation, she was a "candidate for vocational rehabilitation."  (Tr. 227).

9        On July 21, 1999, Dr. Richard S. Jung, M.D[5].,  performed an epidural steroid injection at the C5-

10  C6 level in response to Plaintiff's ongoing complaints of right upper extremity cervical pain.  (Tr. 201).  On

11  August 30 2000, Dr. Jung evaluated Plaintiff for pain management and interpreted Plaintiff's myelogram

12  results as showing "no significant central canal stenosis, mild degenerative disc disease at C5-C6 with very

13  mild neuroforaminal narrowing bilaterally at C5-C6 and C6-C7.  (Tr. 194-195).  In September and

14  October 2000, Dr. Jung gave Plaintiff more "multilevel cervical facet joint injections" in attempts to alleviate

15  her pain.  (Tr. 184, 189).

16       On January 9, 2001, Dr. Steven D. Feinberg, M.D., a Board-certified specialist in physical

17  medicine and rehabilitation, examined Plaintiff.  (Tr. 226).  Dr. Feinberg's report included the following

18  diagnoses:

19        1.    C5-6 cervical spondylosis
          2.    Right C8-T1 and/or lower brachial plexus neuropathic pain problem
20        3.    Depression

21  (Tr. 229).  He noted that Plaintiff suffered decreased right grip strength, but rated her subjective pain as

22  "only slight to moderate."  (Tr. 226-230).  Dr. Feinberg agreed with Dr. Gravina that Plaintiff's condition

23  was "permanent and stationary", and concluded that her disability precluded her from "repetitive neck

24  _____

25       [4]A medical condition is deemed "permanent and stationary" if it is not likely to improve with active
    medical or surgical treatment.  (Tr. 288).

26

27       [5]Dr. Gravina referred Plaintiff to Dr. Jung for treatment and evaluation for Plaintiff's cervical radicular
    pain.  (Tr. 201).

28
                                                    4

United States District Court

For the Northern District of California

1    motions, overhead work with the right upper extremity, and forceful work activities using the right upper

2    extremity." (Tr. 230). Dr. Feinberg addressed Plaintiff's work status by stating, "[I]f she were interested,

3    she would be medically appropriate for vocational rehabilitation." (Tr. 229). Throughout 2001, the record

4    reflects ongoing treatments consisting of facet joint injections which were given to Plaintiff in response to

5    continued subjective complaints. (Tr. 19).

6        In July 2001, cervical spine MRI results "showed findings compatible with annular tearing at C4-5

7    and possible other levels, some straightening of the cervical lordosis with degenerative disc disease from C4

8    to C7, but with no significant central canal narrowing or compression at any level, and no evidence for large

9    herniation or disc extrusion. (Tr. 300-302).

10       On January 23, 2002, Plaintiff underwent a "comprehensive orthopedic evaluation" performed by

11   Dr. Roger Fontes, M.D. (Tr. 304-307). He described "cervical spondylosis with some signs of persistent

12   radiculopathy." (Tr. 306). Upon physical examination, Dr. Fontes found that there were limitations of

13   cervical spine motions with subjective decrease in sensation on the right side. *Id.* According to Dr.

14   Fontes, cervical lordosis was "normal" and there were no other signs of focal atrophy or radiculopathy in

15   the upper extremities. *Id.* Motor strength and reflexes were also "normal." *Id.* Plaintiff's coordination and

16   gait were also "normal" without the use of assistive devices. (Tr. 305). Dr. Fontes concluded on the basis

17   of his findings that Plaintiff was able to do lifting of 10 to 15 pounds frequently and 20 to 25 pounds

18   occasionally. (Tr. 307). He also stated that crawling, crouching, balancing, and climbing would be difficult

19   for Plaintiff, and recommended that "she do these only occasionally." *Id.*

20       In March 2002, Plaintiff was treated for acute symptoms of peripheral vertigo and tinnitus related to

21   fluid retention due to her menstrual cycle, and for fatigue with diagnostic impressions including dehydration

22   and improved anemia. (Tr. 19).

23       On April 1, 2002, another cervical spine MRI showed findings similar to those revealed by

24   previous studies, with no abnormalities at the level of the foramen magnum, no intrinsic cervical cord

25   abnormalities, and no marked central canal narrowing or forminal encroachment at any cervical level. (Tr.

26   298).

27       On May 15, 2002, Board-certified neurological surgeon Theodore C. Baiz, M.D., performed an

28                                                              5

examination on Plaintiff and described no significant change in complaints since previous examinations in April 1999 and September 2001, when "conservative management" was recommended due to the "paucity of clinical findings." (Tr. 386-387).  Furthermore, Dr. Baiz noted that Plaintiff was "alert and cooperative, with grossly intact cranial nerves and only minimally limited neck maneuvers." (Tr. 386).  He recommended continuing conservative treatment as well as rehabilitation or retraining for "work that [was] not the heavy baggage work that she did in the past." (Tr. 387).

On October 2, 2002, Plaintiff underwent a consultative orthopedic evaluation performed by Dr. Calvin Pon, M.D., a Board-certified specialist in physical medication and rehabilitation.  (Tr. 316-320).  Dr. Pon's diagnoses indicated that Plaintiff suffered from chronic neck pain with right cervical radicular symptoms and left elbow pain with possible epicondylitis.  (Tr. 317, 319).  Based on his observations of Plaintiff, Dr. Pon noted that Plaintiff exhibited "no manifestation of discomfort" during the evaluation except for increased neck pain upon lateral bending and rotation.  (Tr. 318).  Dr. Pon concluded that Plaintiff was able to lift 10 pounds frequently, with occasional stooping, climbing ladders, crawling, and reaching with probably symptomatic limitations on use of the right upper extremity.  (Tr. 319-320).  Dr. Pon further concluded that Plaintiff had no restrictions on use of the left upper extremity or on standing/walking and/or sitting for six hours per day, crouching, kneeling, squatting, climbing stairs, or operating leg/foot controls. *Id.*

On October 3, 2002, Dr. Joseph Fenerty, M.D., gave Plaintiff an epidural steroid injection in response to Plaintiff's complaints of pain in her left elbow and forearm.  (Tr. 146-148).

On February 7, 2003, Plaintiff underwent a consultive psychological evaluation administered by Dr. Gary G. Balestin, Ph.D., a Board-certified neuropsychologist.  (Tr. 330-35).  Dr. Balestin reported that Plaintiff's functional intelligence was in the low average range, with no diagnosed mental disorders other than depression secondary to chronic pain.  (Tr. 333-34).  He also noted that Plaintiff was fully oriented and demonstrated normal status, with no evidence of neurovegetative symptoms or impairment of gross or fine motor skills.  (Tr. 330-31).  However, Dr. Balestine concluded that Plaintiff's level of impairment with respect to her ability to adapt to stress in a job situation was moderate to severe.  (Tr. 334).

On April 15, 2003, Dr. Gravina re-referred Plaintiff to Dr. Fenerty for another epidural steroid

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

injection in response to complaints of pain in her neck.  (Tr. 388).  Dr. Fenerty reported that Plaintiff had

some improvement after her last injection in 2002, but that "her symptoms had returned in the recent past

with increasing activity levels."  *Id.*  He further noted that Plaintiff began to develop significant neck

discomfort approximately ten minutes after the injection, which he resolved by administering prescription

medication.  (Tr. 389).  Upon release, Dr. Fenerty informed Plaintiff that she was a "candidate for

approximately three epidural steroid injections in any one 12 month period."  *Id.*

In a letter to the SSA dated October 2003, Dr. Tom Peabody, Ph.D., clinical psychologist, opined

that Plaintiff was disabled by her psychiatric condition and could not be expected to function in work

situations for the next 18 to 24 months.  (Tr. 392).  According to Dr. Peabody, Plaintiff's symptoms for

which she sought psychiatric treatment included symptoms of "anxiety, depression, disturbed sleep, poor

concentration, agitation, obsessive thoughts, fearfulness, and compulsive behavior.  *Id.*  Also described

were symptoms of stress deriving from conflicts with family members.  *Id.*  Dr. Peabody based his opinion

on four psychotherapy sessions which took place from May to June 2003.  (Tr. 392).

**C.     Testimony at Hearing**

At the October 21, 2003 hearing before ALJ Churchill, Plaintiff appeared in person with her

representative, Ms. Egan.  Also present at the hearing was Ms. Rynd, the vocational expert.  (Tr. 402).

ALJ's Examination of Plaintiff

At the hearing, Plaintiff testified as follows:

(1)     she is 45 years old and has a high school education  (Tr. 406);

(2)     she is married and lives in a household with her husband and four children  (Tr. 406, 426);

(3)     she is able to drive, but does not currently work  (Tr 406-407);

(4)     she injured her right shoulder and neck by stacking luggage in the cargo bin of an airplane in

July 1998  (Tr. 409-412);

(5)     she developed neurological injuries in her right arm  (Tr. 412);

(6)     she is in pain all the time despite taking medication  (Tr. 413);

(7)     she takes the following medications for pain and depression:  Flexeril, Zoloft, Tyzanadine,

Ibuprofen, Xanax, and Darvocet  (Tr. 420);

7

**United States District Court**

For the Northern District of California

(8)     she gets cervical injections into her neck to alleviate the pain  (Tr. 414);

(9)     the narcotic medication provides approximately 30% relief, but the pain is never gone  (Tr. 417);

(10)    she does not always take the medication as prescribed because it makes her sleepy  (Tr. 416);

(11)    she has difficulties with rotating and flexing her neck  (420);

(12)    she uses a collar and also has a TENS unit  (Tr. 421);

(13)    she dresses and bathes herself, but gets numbness and tingling in her right arm  (Tr. 422);

(14)    she is able to manipulate items with her right hand, but drops some things  (Tr. 422);

(15)    she drives often times using her left hand  (Tr. 423);

(16)    she saw Dr. Peabody for her mental health for three months  (Tr. 424);

(17)    she makes breakfast and lunch everyday for her two boys  (Tr. 426);

(18)    she folds clothes, reads, prays, and goes to church  (Tr. 428-429);

(19)    she shares other household chores with her husband and daughter  (Tr. 428-431);

(20)    she has difficulty sitting for long periods of time because it bothers her neck  (Tr. 433);

(21)    she could likely lift not more than ten pounds  (Tr. 434);

(22)    she receives Workers' Compensation for lifetime, but fears having surgery will leave her in a wheelchair  (Tr. 435);

(23)    she only drives short distances to her son's school, the store, or to church  (Tr. 436);

(24)    she does not do physical therapy because it makes the pain worse  (438);

(25)    she became depressed when her mother died on October 16, 1999  (Tr. 440);

(26)    she has trouble concentrating  (Tr. 441);

(27)    she sometimes has trouble maintaining attention due to the pain  (Tr. 443);

(28)    she quit her last job as a bible study teacher because of the physical pain and the depression  (Tr. 443);

(29)    she uses ice and heat daily  (Tr. 444);

(30)    the pain feels like "pins and needles" and a "burning sensation"  (Tr. 445);

United States District Court

For the Northern District of California

(31)   she gets agitated easily now, has no friends, and no money  (Tr. 445);

(32)   she refused vocational rehabilitation because she could not do clerical office work  (Tr. 448).

<u>ALJ's Examination of Vocational Expert Nancy Rynd</u>

At the hearing, Nancy Rynd testified that:

(1)   given the ALJ's hypothetical, there are two light, unskilled positions that exist in the national economy that are appropriate for Plaintiff  (Tr. 450);

(2)   the first position is self-service parking lot attendant, Dictionary of Occupational Titles ("DOT") code 915.473-010.  There are over 100,000 of these positions available in the national economy.  (Tr. 450);

(3)   the second position is information clerk, but the DOT code is not listed because there are only 30,000 such positions available in the national economy  (Tr. 450).

<u>Ms. Egan's Examination of Vocational Expert Nancy Rynd</u>

In response to Ms. Egan, VE Nancy Rynd testified that:

(1)   limitations on Plaintiff's mental residual functional capacity ("MRFC") would eliminate Plaintiff's ability to perform in a normal workday or workweek  (Tr. 452);

(2)   Plaintiff's mental limitations might become an issue, especially with the information clerk position, where she is likely to have contact with the public  (Tr. 452).

**D.     The ALJ's Findings**

ALJ Churchill made the following findings:

1.     [Plaintiff] met the special insured status requirements of the Social Security Act through June 30, 2003.

2.     [Plaintiff had] not engaged in substantial gainful activity since September 16, 1998, the alleged onset date of disability. Subsequent work activity as a Bible study prayer [sic] for one hour per week was not substantial gainful activity.

3.     [Plaintiff was] 46 years old, has 12 years of education, and worked as a bookkeeper, ramp agent, an airline cabin worker, picker/packer, and Bible study prayer [sic].

4.     The medical evidence establishe[d] that [Plaintiff] has severe

multilevel disc disease with cervical spondylosis and depressive and anxiety disorders but does not have an impairment or combination of impairments of that level of severity listed or medically equal to one listed in the Listing of Impairments in Appendix 1 to Subpart P of Regulations No. 4.

5.      Pursuant to 20 C.F.R. 404.1529-416.929 and the discussion above, the alleged "disabling" severity of [Plaintiff's] subjective complaints [was] not reasonably related to the objective medical and other evidence.

6.      [Plaintiff] has the residual functional capacity to perform light work involving simple repetitive tasks and occasional reaching with the right (dominant) upper extremity, avoidance of heights and ladders, and with only slight limitations of handling, fingering, and feeling, including gross and fine manipulations, with the right upper extremity (20 C.F.R. 404.1567.

7.      [Plaintiff] is precluded by medically determinable impairments from doing past relevant work.  The burden shifts to the Commissioner to show whether [Plaintiff] can do other work.

8.      Considering the [Plaintiff's] age, education, work experience and residual functional capacity, she is capable of performing other jobs which exist in significant numbers in the national economy within the framework of Rule(s) 202.20 and 202.21 of Table No.2, Appendix 2 to Subpart P of Regulations No.4, and consistent with the testimony of the vocational expert, including the jobs of self-service parking lot attendant and information clerk.

9.      [Plaintiff] is not under a "disability" as defined in the Social Security Act, as amended, at any time through the date of this decision. (20 C.F.R. 404.1520 (f)).

10.     No basis is found for the re-opening of any prior determinations or decisions based on previous applications (20 C.F.R. 404.988).

(Tr. 21-23).

## III.  LEGAL STANDARD

### A.      Standard of Review

Summary judgment is appropriate if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court may disturb the Commissioner's final decision "only if it is not supported by substantial evidence or is based on legal error." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Ninth Circuit defines substantial evidence

10

as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.* This Court must uphold the ALJ's decision where the evidence is "susceptible to more than one rational interpretation." *Id.* at 1040. The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. *Id.* at 1039.

The ALJ's findings, however, must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). If the ALJ applied an improper legal standard, this Court may remand the case for further consideration. "[C]onsidering the record as a whole, the Court must weigh both the evidence that supports and detracts from the [ALJ]'s conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). In addition, the ALJ is responsible for ensuring that the evidence is carefully considered and that the proceeding is fairly conducted. *Singer v. Weinberger*, 513 F.2d 176, 178 (9th Cir. 1975).

**B.       Disability Determination**

Pursuant to Title II of the Social Security Act, people who suffer from physical or mental disabilities are eligible to receive payment of disability insurance benefits. 42 U.S.C. § 423(a)(1). To qualify for Title II benefits, a claimant must establish a medically determinable physical or mental impairment that is expected to result in death or last for a continuous period of at least twelve months which prevents him from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Additionally, to establish a disability, a claimant must "not only show that he is precluded from engaging in his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area where he lives, or whether he would be hired if he applied for work." 42 U.S.C § 423(d)(2)(A); 20 C.F.R. § 404.1505.

An applicant for disability insurance benefits must establish a "severe impairment(s) that causes an

United States District Court

For the Northern District of California

inability to perform past relevant work. *Clem v. Sullivan,* 894 F.2d 328, 330 (9th Cir. 1990); 20 C.F.R. § 404.1560(b). The burden then shifts to the Commissioner to show that the claimant can perform other types of work existing in the national economy which are consistent with the claimant's medically determinable impairments, functional limitations, age, educational, and work experience. *Green v. Heckler,* 803 F.2d 528, 530 (9th Cir. 1986). To determine whether this burden is met, the ALJ must consider the combined effect of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity. *Marci v. Chater,* 93 F.3d 540, 545 (9th Cir. 1996).

In determining whether a claimant is disabled, "all of the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" are considered. 20 C.F.R. § 404.1529. "Objective medical evidence" means "medical signs [shown by medically acceptable clinical diagnostic techniques]." *Id.* "Other evidence" includes statements or reports from the claimant, treating or examining physicians, and others regarding the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect his ability to work. *Id.*

To determine whether a claimant is disabled and entitled to benefits, the Commissioner of Social Security conducts a five-step sequential inquiry. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. Using this five-step sequential inquiry promulgated by the Social Security Administration, the ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If not, the second step asks whether the claimant has a severe impairment. In step three, the ALJ determines whether the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. § 404.1520. If the claimant does not have such a condition, step four asks whether the claimant has the Residual Functional Capacity[6] to perform his past relevant work. If

---

[6]Residual Functional Capacity ("RFC") refers to the claimant's maximum sustained work capacity for sedentary, light, medium, heavy, or very heavy work. In assessing an individual's RFC, the ALJ must consider symptoms, including pain, medical signs and laboratory findings, and other evidence. 20 C.F.R. §

12

United States District Court

For the Northern District of California

1  not, step five requires that the ALJ consider whether the claimant has the ability to perform other work

2  which exists in substantial numbers in the national economy.  20 C.F.R. 404.1520(b)-(f); 404.920(b)-(f).

3

4  **IV.  DISCUSSION**

5  In her motion for summary judgment, Plaintiff argues that ALJ Churchill made numerous errors in

6  his decision regarding Plaintiff's claim for disability insurance benefits.  Plaintiff moves for summary

7  judgment or, in the alternative, remand for additional proceedings.

8  Defendant argues that ALJ Churchill's decision is supported by substantial evidence and free of

9  legal error.  Defendant further argues that ALJ Churchill properly weighed the medical evidence of record,

10  correctly discredited Plaintiff's subjective complaints of pain, and properly relied on the VE's testimony as

11  substantial evidence that there are a significant number of jobs in the national economy that Plaintiff can

12  perform.  For these reasons, Defendant asks the Court to uphold the decision of the Social Security

13  Administration and grant its motion for summary judgment.

14  Here, the ALJ considered all five steps of the five-step sequential process and found that Plaintiff

15  was not disabled.  At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful

16  activity because she had not worked since September 16, 1998, the alleged onset date of disability.  (Tr.

17  22).  At step two, he found Plaintiff to have severe medical impairments such as multilevel disc disease with

18  cervical spondylosis and depressive and anxiety disorders.  *Id.*  However, at step three, he concluded that

19  Plaintiff's impairments did not meet or equal the listed impairments located in the Listing of Impairments,

20  Appendix 1; thus Plaintiff could not be labeled as conclusively disabled.  *Lester v. Chater,* 81 F.3d 821,

21  828 (9th Cir. 1995); 20 C.F.R. § 404.1520(d).  At step four, the ALJ found Plaintiff did not have the

22  residual functional capacity to perform her past relevant work as an airline luggage/cabin worker.  (Tr. 22).

23  At the fifth step of the analysis, the burden shifted to the ALJ to prove that there were other jobs that

24  existed in significant numbers in the national economy which Plaintiff could perform consistent with her

25  medically determinable impairments and symptoms, functional limitations, age, education, skills, and work

26  _____

27  404.1529(a).

28
13

**United States District Court**
For the Northern District of California

experience.  Taking these factors into consideration, ALJ Churchill found that Plaintiff retained the residual

functional capacity to perform "light work" which currently exists in significant numbers in the national

economy.  (Tr. 21).

**A.      Whether the ALJ's Failure to Give Controlling Weight to the Opinions of Plaintiff's Treating Doctor Merits Summary Judgment or, in the Alternative, Remand for Additional Proceedings**

Plaintiff argues that the ALJ's failure to give "controlling weight[7]" to the opinions of the doctors who

"treated" Plaintiff merits summary judgment in her favor, or in the alternative, remand.  (*See* Plaintiff's

Motion and Notice of Motion for Summary Judgment and Remand ("Plaintiff's Memo") at 13).  More

specifically, Plaintiff asserts that the ALJ gave "greater weight" to the opinions of the medical consultants

that were employed by the Commissioner, than to Dr. Gravina, her treating neurologist; Dr. Peabody, her

treating psychologist; and Dr. Balestine, her examining psychologist.

It is well settled that "more weight is given to a treating physician's opinion because a treating

physician 'is employed to cure and has a greater opportunity to know and observe the patient as an

individual.'"  *Andrews,* 53 F.3d at 1041 (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.

1989) .  However, the treating physician's opinion is not necessarily conclusive as to either a physical

condition or the ultimate issue.  *Thomas v. Barnhart,* 278 F.3d 947, 956 (9th Cir. 2002); *see also*

*Magallanes,* 881 F.2d at 751; *Rodriguez v. Bowen,* 876 F.2d 759, 762 (9th Cir. 1989).  The ALJ may

disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so,

and this decision must itself be based on substantial evidence.  *Rodriguez,* 876 F.2d at 762.  This burden

can be met by providing a detailed summary of the facts and conflicting clinical evidence, along with a

reasoned interpretation thereof.  *Id.*  To the extent that the non-treating physician's opinion rests on

objective clinical tests, it must be viewed as substantial evidence.  *Magallanes,* 881 F.2d at 751.

Additionally, the ALJ's reasons for rejecting the treating physician's opinion must be "clear and convincing."

*Rodriguez,* 876 F.2d at 762.

In this case, Plaintiff argues that the ALJ did not give proper weight to the opinions of Dr. Gravina,

---

[7]"Controlling weight" is the term used by the Social Security Administration to describe the weight given to a medical opinion from a treating source that must be adopted. (SSR 96-2p) [Social Security Ruling].

14

United States District Court

For the Northern District of California

1   Dr. Peabody, and Dr. Balestine.  Dr. Gravina, treating neurologist, assessed Plaintiff's injury as "permanent

2   and stationary" and declared her to be unemployable since September 1998 because of her neck injury.

3   (Tr. 275).  Similarly, Dr. Peabody, treating psychologist, opined that Plaintiff could not be expected to

4   work for a period of 18 to 24 months.  (Tr. 392).  Dr. Balestine, consultative neuropsychologist, concluded

5   that Plaintiff's ability to adapt to stress in a job situation was moderate to severe.  (Tr. 334).  To the

6   contrary, the other consultative physicians of record, namely Drs. Feinberg, Fontes, Baiz, and Pon,

7   performed independent examinations of Plaintiff and recommended that Plaintiff either participate in

8   vocational rehabilitation for purposes of finding "lighter work," or that she adhere to certain physical

9   limitations (i.e. occasional lifting, limited walking/sitting/crouching, etc).  (Tr. 229, 307, 387, 319-320).

10       When there is conflicting medical evidence, the [ALJ] must determine credibility and resolve the

11   conflict."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992).  Although the treating physician's

12   opinion is given deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting

13   opinion of an examining physician if that opinion is based on independent clinical findings.  *Thomas,* 278

14   F.3d at 957.

15       Here, the diagnoses and recommendations of Drs. Feinberg, Fontes, Baiz, and Pon were founded

16   upon individual physical examinations of Plaintiff as evidenced by the record.  (Tr. 226, 304, 386, 316).

17   Dr. Fontes and Dr. Pon each gave Plaintiff an individual comprehensive orthopedic evaluation before

18   reaching a favorable finding that Plaintiff could lift 10-15 pounds, as well as crawl, stoop, climb, and reach.

19   (Tr. 304-307, 316-320).  As a result, the ALJ has the discretion to rely on such independent clinical

20   findings as substantial evidence.  *Thomas,* 278 F.3d at 957.  Moreover, Dr. Gravina, the treating physician

21   Plaintiff most relies on, clearly noted on May 26, 1999, that although Plaintiff should not return to her

22   previous job, she was a "candidate for vocational rehabilitation," (Tr.  227), which is not inconsistent with

23   the findings of Drs. Feinberg and Baiz upon their respective examinations.  (Tr. 229, 387).

24       In considering the weight of the evidence, as supported by the independent clinical findings of Drs.

25   Feinberg, Fontes, Baiz and Pon, Plaintiff's arguments do not provide the Court a basis to find that the ALJ's

26

27

28

decision was not based on substantial evidence.[8]   Accordingly, Plaintiff's argument fails and this Court

denies Plaintiff's motion for summary judgment on this issue.

Plaintiff further contends that there are sufficient grounds for remand because the ALJ failed to fully

develop the medical record.  (Plaintiff's Memo at 16:21-22).   She argues that the ALJ erred when

concluding that Plaintiff's application for benefits included no documentary evidence of medical

examinations or treatment before December 1998.  (Tr. 18).  She relies on 20 C.F.R. § 404.1512(d)

which provides in pertinent part:

> Our responsibility.  Before we make a determination that
> you are not disabled, we will develop your complete
> medical history for at least the 12 months preceding the
> month in which you file your application unless there is
> a reason to believe that development of an earlier period
> is necessary.

20 C.F.R. § 404.1512(d).

In support of her claim, Plaintiff references page five of the Disability Report (SSA form 3368),

which shows that there were multiple emergency room visits to SFO Medical Center/Services from July 17,

1998 through 1999.  (Tr. 41).  To Plaintiff's credit, these medical records are contradictory to the ALJ's

finding that there were no examinations before December 1998.  However, as C.F.R. § 404.1512(d)

suggests, the SSA generally will obtain medical evidence for the period beginning twelve months prior to

the date of application, unless development of an earlier period is necessary.  In this case, Plaintiff filed her

current application on July 22, 2002.  (Tr. 91-93).  Thus, the ALJ fulfilled his obligation by obtaining

medical records beginning in December 1998 from Mills Peninsula Hospital.  (Tr. 139-224).

Pointing to 20 C.F.R § 404.1512(e), Plaintiff also claims that the ALJ had the duty to "re-contact

the treating physician for clarification" as to an any conflicts, ambiguities, or necessary additional medical

evidence. (*See* Plaintiff's Opposition to Respondent Commissioner's Opposition to Appellant's Opening

---

[8]Plaintiff also relies on SSR 96-2p in asserting that "the treating specialist is the individualmost qualified to render opinions regarding an individual's [residual functional capacity].  (Plaintiff's Memo at 16:5-8).  The regulation states in relevant part, "Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be 'not inconsistent' with the other 'substantial evidence' in the individual's case record.  Here, as explained above, the ALJ may rely on the conflicting medical opinion of a non-treating physician, if supported by independent clinical findings, i.e. substantial evidence.  Therefore, Plaintiff's reliance on SSR 96-2p is misplaced.

16

1  Brief ("Reply") at 4:9-12.  However, a more detailed reading of the regulation is required to determine if

2  Plaintiff's claim is meritorious.  The regulation in relevant part states:

3           Recontacting medical sources.  When the evidence we receive
             from your treating physician or psychologist or other medical
4           source is inadequate for us to determine whether you are disabled,
             we will need additional information to reach a determination or
5           a decision.

6  20 C.F.R § 404.1512(e).

7  The regulation on which Plaintiff relies clearly states that an obligation to recontact medical sources exists

8  when the medical evidence on record is inadequate to make a disability determination.  Here, the ALJ relies

9  on evidence that consists of medical records which predate Plaintiff's current application approximately

10  three and half years.  Consequently, the ALJ fulfilled his legal duty to develop the record.  Accordingly, the

11  Court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion on this issue.

12  **B.      Whether the ALJ Improperly Discredited Plaintiff's Subjective Complaints of Pain**

13          Plaintiff claims that the ALJ improperly discredited her subjective complaints of pain in violation of

14  SSR 96-7p. (Plaintiff's Memo at 16-22).  The ALJ stated in his unfavorable decision that Plaintiff's

15  subjective complaints and testimony were not fully supported by the objective medical  findings.  (Tr. 21).

16  In his decision, he cites the following reasons:

17           1.  Plaintiff's ability to perform her daily activities
             2.  Dr. Pon's observation that Plaintiff had "no manifestation of discomfort
18               on neck movement despite complaints of pain"
             3.  Plaintiff received no surgical treatment
19           4.  Not taking pain medication
             5.  Plaintiff's Refusal of Vocational Rehabilitation
20

21  *Id.*  The Court shall consider each of ALJ's Churchill's reasons in turn.

22          1.      Plaintiff's daily activities

23          Pain is subjective in both existence and degree, and therefore the ALJ must present clear and

24  convincing reasons for not relying on a claimant's subjective complaints of pain.  *Johnson v. Shalala,* 60

25  F.3d 1428,1433 (9th Cir. 1995).  In *Thomas,* the court held that the ALJ, when weighing a claimant's

26  credibility, may consider inconsistencies between a claimant's testimony and conduct, a claimant's daily

27  activities, and testimony from physicians and third parties concerning the nature, severity, and effect of the

28                                                      17

*United States District Court*
For the Northern District of California

1  symptoms of which a claimant complains.  *Thomas,* 278 F.3d at 958-959.  Thus, if the ALJ's credibility

2  finding is supported by substantial evidence in the record, courts will not second-guess that decision.  *Id.*

3        Plaintiff points to SSR 96-7p which provides: "[W]henever the claimant's statements about

4  intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by

5  objective medical evidence, the [ALJ] must make a finding on the credibility of the claimant's statements

6  based on a consideration of the entire case record.  This includes medical signs and laboratory findings, the

7  individual's own statements about the symptoms, any statements provided by treating or examining

8  physicians or psychologists and other persons about the symptoms and how they affect the individual, and

9  any other relevant evidence in the case record.  SSR 96-7p.

10        Here, the ALJ exercised "ordinary techniques of credibility evaluation" and weighed factors relevant

11  to Plaintiff's symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see also* Thomas, 278 F.3d at 960.  The

12  ALJ considered Plaintiff's involvement in "daily activities" in determining whether her pain was severely

13  disabling.  (Tr. 21).  He found that Plaintiff was able to perform various daily activities, including household

14  chores such as folding laundry, vacuuming, preparing meals, making beds, planting flowers, doing crafts,

15  watching television, reading, and attending church.  *Id.*  In *Fair v. Bowen,* the court held that "if, despite the

16  claimant's claims of pain, the claimant is able to perform household chores and other activities that involve

17  many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to

18  conclude that the claimant's pain does not prevent the claimant from working."  *Fair v. Bowen,* 885 F.2d

19  597, 603 (9th Cir. 1989).  In other words, "if the claimant engages in numerous daily activities involving

20  skills that could be transferred to the workplace, [the ALJ] may discredit the claimant's allegations upon

21  making specific findings relating to the claimant's daily activities."  *Bunnell v. Sullivan,* 947 F.2d 341, 346

22  (9th Cir. 1991).  Here, the ALJ interpreted Plaintiff's ability to perform such daily functions as being

23  inconsistent with her subjective complaints of incapacitating pain.  "Where the evidence is susceptible to

24  more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must

25  be upheld."  *Thomas,* 278 F.3d at 954.

26        2.    Dr. Pon's observation

27        The ALJ further cited Dr. Pon's observation that Plaintiff had "no manifestation of discomfort on

28

United States District Court
For the Northern District of California

neck movement despite complaints of pain" as support for his decision.  (Tr. 22).  Plaintiff alleges that the ALJ used "selective medical evidence in assessing Plaintiff's allegations of pain and limitations."  Plaintiff's Memo at 17:14-15.  Plaintiff argues that "had [the ALJ] reviewed the medical evidence of record objectively and in its entirety, [the ALJ] would have found ample evidence of medically determinable impairments that would reasonably be expected to result in the pain and limitations as alleged by Plaintiff."  *Id.* at 17:15-19.

SSR 96-7p states in pertinent part:

> 1.   First, the [ALJ] must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the [Plaintiff]'s pain.
>
> 2.   Second, once an underlying physical or mental impairment that could reasonably be expected to produce the [Plaintiff]'s pain has been shown, the [ALJ] must evaluate the intensity, persistence, and limiting effects of the [Plaintiff]'s symptoms to determine the extent to which the symptoms limit the [Plaintiff]'s ability to do basic work activities.

SSR 96-7p.

Here, Plaintiff's argument falls short in that it fails to take into consideration the ultimate issue that must be decided by the ALJ.  As stated above, the second prong asks whether Plaintiff's injury is so severe as to preclude her from doing "basic" work activities.  (SSR 96-7p, 33484, 33485).  In his decision, the ALJ found that Plaintiff had an underlying physical impairment, a "severe multilevel disc disease with cervical spondylosis."  (Tr. 22).  However, in light of such factors as Plaintiff's ability to continue with her "daily activities" (Tr. 426-434), multiple medical opinions that suggested Plaintiff was a "candidate for vocational rehabilitation" (Tr. 229, 387), and Dr. Pon's observation during an orthopedic evaluation that Plaintiff "manifested no discomfort on neck movements despite complaints of pain," the ALJ provided "specific, legitimate reasons," supported by the record as to why Plaintiff's complaints were not of a disabling severity necessarily precluding her from performing "basic work."  *Bunnell,* 947 F.2d at 346.

3.    <u>No surgical treatment</u>

The ALJ also noted that no surgical treatment had been recommended or performed on Plaintiff, other than epidural steroid injections.  (Tr. 21).  Plaintiff asserts that the ALJ acted unreasonably in concluding that surgery would guarantee alleviation of Plaintiff's pain.  Plaintiff's Memo at 18:21-23.  In

19

United States District Court

For the Northern District of California

1   support of her argument, Plaintiff refers to Dr. Gravina's diagnosis that Plaintiff's symptoms are "permanent

2   and stationary" and "thus not likely to improve with active medical or surgical treatment."   *Id*. at 18:24-19:1

3   .  Additionally, she argues that the ALJ failed to note "the sheer number of treatment modalities Plaintiff has

4   attempted in efforts to control her pain"in violation of SSR 96-7p.[9]   *Id*. at 19:2-23 .

5           When determining [Plaintiff]'s credibility regarding [her] subjective complaints of pain, the ALJ must

6   not only consider the objective medical evidence, but also statements or reports from the treating or

7   examining physician(s) and their diagnoses.  20 C.F.R. § 404.1529(a).  Here, Plaintiff relies on a portion of

8   Dr. Gravina's diagnosis (i.e. permanent and stationary) rather than referencing his entire medical opinion.

9   (Plaintiff's Memo at 18:25).  Dr. Gravina concluded later in his opinion from the myelogram CT scan that

10  Plaintiff had "only mild degenerative disc diseases at C5-C6 with very mild neural foraminal narrowing and

11  no significant central canal stenosis."  (Tr. 194-195, 298).   Although Dr. Gravina diagnosed both Plaintiff's

12  injury as "permanent and stationary," and her inability to return to her former occupation doing "heavy work"

13  (Tr. 288, 227), he opined that she was a "candidate for vocational rehabilitation."  (Tr. 227).  Similarly, Dr.

14  Baiz reported that the "paucity of clinical findings" led him to recommend "conservative treatment" and also

15  rehabilitation or retraining for "lighter work."  (Tr. 386-387).  *Johnson,* 60 F.3d at 1434.  A prescription of

16  conservative treatment generally "suggests a lower level of both pain and functional limitation."  *Id*.

17          In furtherance of her contention, Plaintiff relies on Dr. Feinberg's psychiatric opinion which stated

18  surgical treatment was not likely to improve Plaintiff's situation.  (Tr. 18:27-19:1).  However, Plaintiff omits

19  the preceding portion of Dr. Feinberg's medical report which is directly related to Plaintiff's subjective

20  complaints of pain.  There, he indicated that he rates her subjective pain as "only slight to moderate."  (Tr.

21  226-230).

22          4.   Plaintiff's decision to take medication on an irregular basis

23          In his decision, the ALJ also noted Plaintiff's decision not to take her pain medication on a regular

24  basis as one of the specific factors considered in assessing Plaintiff's credibility as to her subjective

25  _____

26          [9]The record clearly reflects a thorough summary of the facts given by the ALJ, which include Plaintiff's
    treatments of epidural steroid injections in July 1999 and bilateral multilevel cervical facet joint injections in
27  2000, 2001,2002, and 2003.  (Tr. 18-20).  Therefore, Plaintiff's assertion that the ALJ did not consider other
    "treatment modalities" is incorrect.  (Tr. 18-21)
28

United States District Court

For the Northern District of California

1  complaints of pain.  (Tr. 21).  Plaintiff argues that she limited her consumption of pain medication due to their

2  side effects.  (Plaintiff's Memo at 20:15-16).  SSR 96-7p states in relevant part, "when assessing the

3  credibility of an individual's statements...the type, dosage, effectiveness, and side effects of any medication

4  the individual takes or has taken to alleviate pain must be considered.  SSR 96-7, 34485.  Plaintiff testified

5  that she takes Darvocet for pain, Flexeril and Tizanadine as muscle relaxants, and Xanax and Zoloft for

6  depression.  (Tr. 419-420).  She also testified that some of the prescribed medication made her "sleepy" and

7  "comatose," and that she sometimes refrained from taking the narcotic pain medication (Darvocet) because

8  she wanted to be "coherent" for her two sons.  (Tr. 416-417, 419).  She also cites additional concerns of

9  becoming addicted, as well as ruining her kidneys.  (Tr. 417).  Plaintiff admitted that the narcotic pain

10  medication, which is prescribed for intake every four hours, does relieve approximately 30% of the pain.

11  (Tr. 417).  Plaintiff further testified to using a collar and a TENS unit at times for pain.  (Tr. 421).

12          The oral hearing transcript, as shown above, reflects the ALJ's efforts to inquire about the types of

13  medication taken, dosage, effectiveness, and side effects.  In doing so, the ALJ acted within his authority to

14  exercise his judgment as to the "disabling severity" of such side effects.  Determinations of credibility,

15  resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.

16  *Andrews*, 53 F.3d at 1039.  Given the alleged severity of Plaintiff's discomfort, it is a reasonable contention

17  that Plaintiff would take every measure affordable in order to alleviate her pain, even if relief is minimal

18  and/or temporary.[10]

19          5.    Plaintiff's refusal of vocational rehabilitation

20          The ALJ cites Plaintiff's "reported refusal of recommended vocational rehabilitation" as the final

21  factor in determining credibility.  (Tr. 21, 448).  Plaintiff argues that she was "going to be trained in clerical

22  office skills," and expressed that "she couldn't do that."  (Tr. 447-448).  Plaintiff further reminded the ALJ

23  _____

24          [10]Plaintiff further asserts that the ALJ violated SSR 96-7p by failing to consider a questionnaire dated
    February 8, 2002, in which Plaintiff's friend, Leo Soto, reaffirmed Plaintiff's subjective complaints of pain and

25  discomfort.  (Tr. 61-66)).  However, the Ninth Circuit provides that "in interpreting the evidence, and
    developing the record, the ALJ does not need to "discuss every piece of evidence."  (*Howard ex rel. Wolff*

26  *v. Barnhart*, 341 F.3d 1012).  Mr. Soto's testimony essentially restated Plaintiff's evidence and thus was
    merely cumulative, and not of probative value.  *In Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393 (9th

27  Cir. 1984) (Secretary need not discuss all evidence presented; rather she must explain why significant probative
    evidence has been rejected).

28

that she "barely passed high school" and stated that she "has to work outside."  (Tr. 448).

According to 20 C.F.R. § 404.1529, the ALJ will not only consider the objective medical evidence in the case record, but also Plaintiff's "efforts to work."  At Plaintiff's oral hearing, the Vocational Expert ("VE"), Nancy Rynd, testified as to Plaintiff's Residual Functional Capacity.  (Tr. 448-453).  She testified that a person with Plaintiff's functional limitations could not perform her past relevant work.  (Tr. 449).  She then testified that Plaintiff had the capacity to work in two particular positions listed in the Dictionary of Occupational Titles ("DOT"),[11] self-service parking lot attendant and information clerk.  (Tr. 450).  She reported that there were over 100,000 self-service parking lot attendant positions available in the national economy, and 30,000 information clerk positions available.  (Tr. 450).

Plaintiff's contention that she could not do "office work" or be anywhere else but "outside" has little to no relevance in light of the VE's recommendation for work as a parking lot attendant.  (Tr. 450).  At most, a parking lot attendant may have to work underground or within a parking structure, neither of which require Plaintiff to acquire sophisticated clerical or computational skills.  Moreover, Dr. Pon concluded upon Plaintiff's examination that she had "no restrictions on use of the left upper extremity or on standing/walking and/or sitting for six hours per day, crouching, kneeling, squatting, climbing stairs, or operating leg/foot controls."  (Tr. 319-320).  Thus, Plaintiff's residual functional capacity is not inconsistent with the job responsibilities of a parking lot attendant as listed in the DOT definition (i.e. parking cars, collecting parking fees).  Plaintiff's Memo at 23:9-14.

Being that the essential role of a VE is to "translate factual scenarios into realistic job market probabilities," it was proper for the ALJ to rely on Nancy Rynd's expert testimony to find that the Plaintiff could perform the two types of jobs the expert identified.  *Johnson,* 60 F.3d at 1436.  Furthermore, it was reasonable for the ALJ to factor Plaintiff's unwillingness to follow the VE's recommendation into his assessment of Plaintiff's efforts to work.  *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1993) (the ALJ may draw reasonable inferences from the evidence and is not obligated to believe every allegation of disabling pain).  The testimony of the VE and the DOT listings both indicate that parking lot attendant jobs

[11]The Dictionary of Occupational Titles ("DOT") is the [Secretary's] primary source of reliable job information, published by the Department of Labor.  One purpose of the DOT is to classify identified job titles by their exertional and skill requirements.  *Terry v. Sullivan,* 903 F.2d 1276 (9th Cir. 1990).

1   (and information clerk jobs ) require only "light work." (Tr. 451). Thus, the ALJ's inference that Plaintiff

2   exhibited limited effort to work was supported by substantial evidence.[12]

3        Based on this analysis, the Court must deny Plaintiff's request for summary judgment and grant

4   Defendant's cross-motion on this issue.

5   **C.      Whether the Hypothetical Posed by the ALJ to the Vocational Expert Adequately Included All of Plaintiff's Limitations**

6

7        On October 21, 2003, at Plaintiff's administrative hearing, the VE testified that

8   Plaintiff has the residual functional capacity to perform "light, unskilled" work, either as a parking lot

9   attendant or an information clerk. (Tr. 450-451). The VE's opinion was given in response to a hypothetical

10  posed by the ALJ. (Tr. 449). Plaintiff contends that both jobs are inconsistent with Plaintiff's Mental

11  Residual Functional Capacity ("MRFC"). Plaintiff's Memo at 23.[13] Plaintiff further contends that the ALJ's

12  hypothetical posed to the VE was "confusing and contradictory." *Id*. at 22.

13       In an administrative hearing, it is commonplace for VE's to provide their opinion in response to

14  hypothetical situations posed by the ALJ. *Thomas,* 278 F.3d at 955; *see also Osenbrock v. Apfel,* 240

15  F.3d 1157, 1165 (9th. Cir. 2000). In order for the testimony of a VE to be considered reliable, the

16  hypothetical posed must include all of the claimant's functional limitations, both physical and mental, as

17  supported by the record. *Thomas,* 278 F.3d at 956. The hypothetical should also be "accurate and

18  detailed, as supported by the medical record." *Osenbrock,* 240 F.3d at 1165.

19       Here, the ALJ posed the following hypothetical to the VE:

20           Assume you have a right-hand dominant individual with
             that vocational profile. Assume that this individual doing
21           an eight hour day can sit for six hours, stand or walk up to six
             hours. Lift, carry 20 pounds occasional and 10 pounds
22           frequently. Can push or pull to that weight. Assume that
             the person can occasionally reach at or above shoulder--
23           at the upper right extremity. And had a slight decrease in

24  _____

25       [12]Subsequent to Plaintiff's onset date of injury, she worked as a part-time children's Bible study instructor from October 1999 to October 2001. (Tr. 448-449). The ALJ concluded that this employment position was not considered "SGA" [Substantial Gainful Activity] because it was not listed in the DOT. (Tr.

26  450). Therefore, Plaintiff's efforts to work as a Bible study instructor were not considered to be SGA.

27       [13]On February 14, 2003, Plaintiff underwent a Mental Residual Functional Capacity Assessment performed by Dr. Ida M. Hilliard, M.D. (Tr. 350-352).

28

23

United States District Court

For the Northern District of California

the handling, fingering and feeling in the upper right extremity.
Otherwise the person can occasionally crawl or squat or stoop
or bend or climb.  She should avoid working at heights or on
ladders.  And can perform simple repetitive tasks.  Can this
person perform any of the past relevant work?

(Tr. 449).  In response to the ALJ's hypothetical, the VE testified that Plaintiff had the RFC to sustain

employment as either a parking lot attendant or an information clerk.  However, the ALJ's hypothetical only

addresses Plaintiff's physical limitations.  It makes no mention of Plaintiff's mental impairments, which are

supported by the medical record.  (Tr. 336-352).  At the hearing, Plaintiff's Representative, Giocanda Egan,

raised the issue of Plaintiff's [MRFC] which indicated the following,

"Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods is 'moderately limited.'"  (Tr. 351).  Based on this "mental assessment," the VE later testified that

Plaintiff's moderate limitation on a normal workday/workweek "might become an issue and eliminate her

ability to perform, especially as an information clerk, due to public contact."  (Tr. 452).

Therefore, while it is true that the VE initially attested to Plaintiff's ability to sustain employment as a

parking lot attendant and/or information clerk, this opinion was offered in response to a hypothetical

highlighting Plaintiff's physical limitations only.   In the same hearing, when later asked to provide an opinion

as to Plaintiff's work capacity, but this time given evidence supporting limitations of Plaintiff's MRFC, the VE

contradicted her earlier testimony.  (Tr. 450-452).  As stated above, in order for the testimony of a VE to

be considered reliable, the hypothetical posed must include all of Plaintiff's functional limitations, both

physical and mental, supported by the record.  *Thomas,* 278 F.3d at 956.  Furthermore, the ALJ is required

to consider the combined effect of all the claimant's impairments without regard to whether any such

impairment, if considered separately, would be of sufficient medical severity.  *Marci,* 93 F.3d at 545 .  The

hypothetical should also be "accurate and detailed, as supported by the medical record."  *Osenbrock,* 240

F.3d at 1165.  In *Thomas,* the Ninth Circuit ruled that the ALJ may "adequately incorporate" a claimant's

MRFC into a hypothetical.  *Thomas,* 278 F.3d at 956.  There, the VE had just heard specific testimony in

regards to Plaintiff's MRFC prior to the ALJ's hypothetical.  As a result, the ALJ directed the VE to fully

credit a specific portion of the record, which the VE had just heard.  *Id.*

United States District Court
For the Northern District of California

24

The ruling in *Thomas* is distinguishable because the ALJ in this case did not incorporate any references to other portions of the record into the hypothetical given, namely Dr. Hilliard's assessment of Plaintiff's mental status.  (Tr. 448-453).  Thus, the VE's conflicting opinions are based on two separate and distinct hypotheticals, both addressing Plaintiff's physical and mental limitations separately.  Neither the administrative hearing transcript nor the ALJ's record reflect any attempt to reconcile the contradictory opinions given by the VE.  The ALJ is responsible for ensuring that the evidence is carefully considered and that the proceeding is fairly conducted.  *Singer*, 513 F.2d at 176, 178.  Accordingly, the Court grants Plaintiff's request for remand for additional proceedings as to the ALJ's hypothetical, and denies Defendant's cross-motion as to this issue.

## V.  CONCLUSION

For the foregoing reasons, the Court hereby DENIES Plaintiff's summary judgment motion and GRANTS Defendant's cross-motion as to the ALJ's weighing of the medical evidence of record and Plaintiff's subjective complaints.  Further, the Court hereby GRANTS Plaintiff's motion for remand for additional proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  Specifically, the Court remands for purposes of vocational clarification in consideration of Plaintiff's physical and mental limitations. Accordingly, the Court hereby DENIES Defendant's cross-motion as to this issue.

**IT IS SO ORDERED.**

Dated:  July 11, 2005

_____
MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court

For the Northern District of California